UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JESSICA THORNTON, | CASE NO. 1:25-CV-00713-JRA |
| Plaintiff, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Jessica Thornton challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Apr. 9, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Thornton applied for DIB on February 26, 2021. (Tr. 139). She alleged she became disabled on December 31, 2015 due to rheumatoid arthritis, fibromyalgia, depression, anxiety, cystitis, gastroesophageal reflux disease, hernia, ankylosing spondylitis, endometriosis, bladder inflammation, chronic UTI, migraines, lymphadenopathy, gastritis, bone infection in her jaw, and dizzy spells. (Tr. 91). After the claims were denied initially and on reconsideration, Ms. Thornton requested a hearing before an administrative law judge. (Tr. 147, 158, 168). On September 19,

1

2022, Ms. Thornton (represented by counsel) and a vocational expert (VE) testified before the ALJ. (Tr. 63-90). On November 9, 2022, the ALJ determined Ms. Thornton was not disabled. (Tr. 113).

On September 8, 2023, the Appeals Council remanded Ms. Thornton's case to evaluate the entire period of disability from the correct date last insured, re-evaluate her severe impairments, and re-evaluate her ability to perform her past relevant work. (Tr. 134-36). On January 24, 2023, Ms. Thornton (represented by counsel) and a different VE testified before a different ALJ. (Tr. 36-62). On February 23, 2024, the ALJ again determined Ms. Thornton was not disabled. (Tr. 17-30). On August 24, 2023, the Appeals Council denied Ms. Thornton's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 404.981). On April 9, 2025, Ms. Thornton timely filed this action. (ECF #1).

FACTUAL BACKGROUND

I.      **Personal and Vocational Evidence**

Ms. Thornton was 28 years old on her alleged onset date and 36 years old at the second hearing. (*See* Tr. 91). She has a date last insured of September 30, 2022. (*See* Tr. 135). She holds two associate's degrees. (Tr. 71, 95). She has past relevant work experience as a food salesclerk and a weight-reduction specialist. (Tr. 59). At the time of the second hearing, she worked 20 hours a week at a grocery store self-checkout line. (Tr. 43-44).

II.     **Relevant Medical Evidence**[1]

Ms. Thornton has a history of rheumatoid arthritis, chronic lower-back pain, and fibromyalgia. (*See* Tr. 825, 1001). In May 2021, she was worried her arthritis was returning as she

---

[1]     Although Ms. Thornton claimed disability in part due to mental impairments, her arguments here relate solely to the ALJ's evaluation of her physical impairments, so I limit my discussion to those impairments.

2

had lower-back and joint pain and inflammation in her hand. (Tr. 802). Her rheumatologist, Dr. Gheorghe Ignat, re-prescribed sulfasalazine that she previously took with success in 2017.[2] (Tr. 801-02). By January 2022, she reported worsening headaches, neck pains, and dizziness. (Tr. 1040). Dr. Ignat suspected her medication was inducing the headaches and prescribed an anti-headache medication. (Tr. 1039). A physical examination found mild synovitis (inflammation of the joint lining) in her hands and tenderness in her feet, but otherwise yielded normal findings. (Tr. 1042). In a follow-up visit the next week, Dr. Ignat noted Ms. Thornton's rheumatoid factor was "very high" and assessed her with seropositive rheumatoid arthritis. (Tr. 1034). By March, Dr. Ignat slowly increased Ms. Thornton's dose of anti-inflammatory medication. (Tr. 1027).

In May 2022, Ms. Thornton was referred for an electromyograph of her legs; it revealed "[c]hronic bilateral lumbosacral radiculopathy with recent worsening by a history of rheumatoid arthritis and fibromyalgia." (Tr. 1003). In June 2022, x-ray imaging of Ms. Thornton's lumbar spine yielded normal findings. (Tr. 1006). At the next follow-up visit in August 2022, Ms. Thornton was also observed with bronchitis, memory problems, gastrointestinal problems, numbness in her legs, and mild radiculopathy in her right L3-L4 vertebrate. (Tr. 1021).

Ms. Thornton first underwent a colonoscopy in December 2016. (Tr. 955). It yielded generally normal findings. (Tr. 956). In November 2020, she complained of esophageal reflux that persisted despite therapy and underwent an endoscopy. (Tr. 936). The doctor observed reflux esophagitis and a small hiatal hernia, but otherwise normal findings. (Tr. 937). She was prescribed

---

[2]      Sulfasalazine is an anti-inflammatory medication prescribed to treat ulcerative colitis and rheumatoid arthritis and it can cause headaches as a side-effect. *See Sulfasalazine*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682204.html (last accessed Nov. 18, 2025).

Omeprazole and a diet to reduce reflux.[3] (*Id.*). In July 2021, she presented to the emergency room with abdominal pain but the doctors could not ascertain the cause of her pain, so she was advised to follow up with her gastroenterologist. (Tr. 927, 931). She did so, where she underwent a colonoscopy. (Tr. 914). By that time, it appears Ms. Thornton's anti-reflux medication was switched from omeprazole to pantoprazole.[4] (*See* Tr. 920). But the record also reports she "took herself off pantoprazole last week and state[d] her pain has improved since then" (*see* Tr. 918), suggesting the medications were switched earlier in July. In August 2021, Ms. Thornton went to her primary-care physician complaining of continuing stomach issues. (Tr. 980). The progress note for that visit notes that the doctor "[a]dvised patient that she likely has IBS" (Tr. 981) but also reported the "gastroenterologist advised that because the colonoscopy is negative, she does not have IBS." (Tr. 980).

Ms. Thornton is assessed with malnutrition (Tr. 361) so her body mass index[5] was regularly monitored:

| | | |
|---|---|---|
| November 21, 2016 | 17 | (Tr. 486) |
| March 31, 2017 | 18 | (Tr. 514) |
| April 24, 2017 | 17.04 | (Tr. 828) |
| May 2, 2017 | 16.8 | (Tr. 831) |
| March 4, 2018 | 17.97 | (Tr. 840) |
| June 3, 2019 | 21.06 | (Tr. 360) |
| January 29, 2020 | 20.7 | (Tr. 846) |
| October 2, 2020 | 19 | (Tr. 703) |

---

[3]     Omeprazole is used to treat gastroesophageal reflux disease (GERD) by reducing the amount of stomach acid that can flow into the esophagus. *See Omeprazole*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a693050.html (last accessed Nov. 25, 2025).

[4]     Pantoprazole is used to treat GERD by reducing the amount of stomach acid. *See Pantoprazole*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a601246.html (last accessed Nov. 25, 2025).

[5]     Body mass index (BMI) is defined as "the ratio of your weight to the square of your height" and is calculated through one of three formulae depending on the units used to measure weight and height. *See* Listing 5.00(F), 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 5.00(F).

| | | |
|---|---|---|
| October 22, 2020 | 18.75 | (Tr. 834) |
| December 31, 2020 | 18 | (Tr. 759) |
| February 19, 2021 | 19.47 | (Tr. 856) |
| March 17, 2021 | 17.97 | (Tr. 859) |
| June 29, 2021 | 16.8 | (Tr. 864) |
| August 13, 2021 | 17.19 | (Tr. 867) |
| October 29, 2021 | 17.97 | (Tr. 982) |
| November 17, 2021 | 18.09 | (Tr. 984) |
| August 16, 2022 | 17.58 | (Tr. 1007) |

## III.    Relevant Opinion Evidence

On April 2, 2019, state agency medical consultant Mila Bacalla, M.D., reviewed Ms. Thornton's file as part of the initial evaluation of her disability application. (Tr. 96-98). Dr. Bacalla opined Ms. Thornton had no exertional limitations; can never climb ladders, ropes, or scaffolds; and must avoid all unprotected heights and hazardous machinery. (Tr. 97). On April 11, 2023, state agency medical consultant Lynne Torello, M.D., reviewed updated medical records and affirmed the findings on reconsideration. (Tr. 109).

On May 13, 2021, Ms. Thornton was evaluated for dizzy spells by Dariush Saghafi, M.D., in connection with her disability application. (Tr. 805-07). Dr. Saghafi diagnosed her with vertigo that can last up to 12 hours. (Tr. 807). Dr. Saghafi opined she can lift, push, and pull up to 20 pounds; bend, walk and stand for at least 60 minutes at a time; understand the environment as well as peers and communicate satisfactorily; and travel independently. (*Id.*).

On January 12, 2022, Ms. Thornton's rheumatologist, Dr. Ignat, completed a physical medical source statement about Ms. Thornton. (Tr. 976-79). He opined Ms. Thornton can sit for 90 minutes at a time and for about four hours in an eight-hour workday, can stand for ten minutes at a time and for less than two hours in an eight-hour workday, must walk for ten minutes every 60 minutes, would need a 20-minute break every two hours, can lift and carry ten pounds rarely and

less than ten pounds occasionally, can handle and finger for 10% of the workday, would be off-task for 20% of the workday, is "incapable of even low-stress work," and would be absent from work more than four days per month. (Tr. 977-79).

## IV.  Relevant Testimonial Evidence

At the hearing, Ms. Thornton explained she struggles to work because she is disoriented and incoherent. (Tr. 50). She left a previous job as a cashier because she accidentally ran together two customers' purchases on a couple occasions due to lapses in concentration. (Tr. 44-45). At the time of the hearing, Ms. Thornton had been working for about a year before the second hearing at a grocery store self-checkout line for 20 hours a week. (Tr. 43-44). While she has been able to "mask," or work despite her symptoms, to earn a living, her condition has been deteriorating such that it is too much to work full-time. (*See* Tr. 49).

While working she often has pain, gets dizzy, and loses concentration. (Tr. 45). She will experience waves of disorientation and then lose sensation in one side of her body, forcing her to stumble away from her station. (Tr. 52). Other times she experiences drops in blood pressure that bring chills. (Tr. 53). These waves often leave her without energy. (*Id.*). Her sleep is inconsistent and often interrupted by pain, strange sensations, and night sweats. (Tr. 51, 55). The lack of sleep harms her mood and concentration. (Tr. 55-56). She has arrived late, left early, and called off work multiple times due to her symptoms. (Tr. 45-46). While she had not been fired or disciplined, her employer has gotten "very aggravated." (Tr. 46).

Ms. Thornton also experiences sensations of numbness in her arms and legs and tingling down her sides. (Tr. 48). The loss of sensation has caused her to lose her grasp, drop things (hindering her ability to cook, or shop for groceries, clean, dress, and care for herself). (Tr. 49, 54).

6

She has applied to remote positions but struggles because her arms go numb and cannot type. (Tr. 50, 54).

She has various flare-ups of her symptoms without warning about three times a month and can last for over a week. (Tr. 56-57). Some days, she wakes with such severe headaches that she cannot think or walk and must lie on her side for relief. (Tr. 51, 56). Or her arms and legs can be so weak or numb that she cannot use her left side. (Tr. 51, 56). Some nights, she may get dehydrated and be unable to sleep from shaking and night sweats. (Tr. 51). Other times, she has flu-like muscle aches. (Tr. 51).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a).

The Commissioner follows a five-step evaluation process found at 20 C.F.R. § 404.1520 to determine whether a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined that Ms. Thornton's work between her claimed disability date and her date last insured was not "substantial gainful activity." (Tr. 19-20). At Step Two, the ALJ identified "rheumatoid arthritis, fibromyalgia, lumbar radiculopathy, and gastritis" as severe impairments. (Tr. 20). At Step Three, the ALJ found Ms. Thornton's impairments did not meet or medically equal the requirements of a listed impairment. (Tr. 22-23). At Step Four, the ALJ determined Ms. Thornton had the following RFC:

> To perform "light work" as defined in 20 C.F.R. § 404.1567(b) except she can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; and occasionally perform balancing, stooping, kneeling, crouching, and crawling. She must avoid unprotected heights, dangerous machinery, commercial driving, and temperature extremes.

(Tr. 23) (cleaned up). The ALJ then found Ms. Thornton could perform her past relevant work as a food salesclerk. (Tr. 28). In the alternative, the ALJ found at Step Five that Ms. Thornton could perform other work in the national economy, including as a collator operator, storage facility rental clerk, and routing clerk. (Tr. 28-29). Thus, the ALJ concluded Ms. Thornton was not disabled. (Tr. 29).

8

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

DISCUSSION

## I.     Listing 5.08

Ms. Thornton first argues the ALJ misinterpreted Listing 5.08 to require a claimant consistently have a body mass index of less than 17.50 when the language of the listing requires two evaluations of such a BMI at least 60 days apart and within a 12-month period. (*See* ECF #10 at PageID 1118-19). The Commissioner responds that even if the ALJ misinterpreted the BMI criterion of Listing 5.08, Ms. Thornton still did not meet the requirement that she comply with prescribed treatment. (ECF #12 at PageID 1141-42).

At Step Three of the sequential evaluation, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments and meets the

10

duration requirement. 20 C.F.R. § 404.1520(a)(4)(iii). Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." *Id.* § 404.1525(c)(3).

The Commissioner concedes the ALJ relied on an outdated version of Listing 5.08 that required two evaluations within a 6-month period instead of the current 12-month period. (ECF #12 at PageID 1141 n.3; *see also Revised Medical Criteria for Evaluating Digestive Disorders and Skin Disorders*, 88 Fed. Reg. 37704, 37706 (effective Oct. 6, 2023)). But this error does not warrant remand because Ms. Thornton has not shown she meets all the criteria of Listing 5.08. A claimant "must point to specific evidence that demonstrates he [or she] reasonably could meet or equal *every* requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F.App'x 426, 432 (6th Cir. 2014) (emphasis added). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433.

Listing 5.08 applies generally to digestive disorders and provides "[w]eight loss due to any digestive disorder despite adherence to prescribed medical treatment, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 12-month period." 20 C.F.R. § 404, Subpt. P, App. 1 § 5.08. Both the current and previous versions require a claimant adhere to prescribed treatment for the digestive disorder. *See Revised Medical Criteria for Evaluating Digestive Disorders and Skin Disorders*, 88 Fed. Reg. at 37706 (amending Listing 5.08's duration requirement only).

The ALJ found Ms. Thornton did not meet either of Listing 5.08's criteria:

Here, there are certainly readings of the claimant's BMI below 17.50 within a 6-month period. However, during this period, the claimant's BMI also fluctuated well above 17.5. There is not a 6-month period in the record that has only BMI readings below 17.5; as noted above, the claimant's BMI fluctuated above this number. Also as noted above, there is a question as to whether the claimant has IBS, testing has not shown the etiology of her abdominal pain, and while she treated for GERD, she

11

stopped taking the medication prescribed for it and felt better. For these reasons, the undersigned finds that the requirements of Listing 5.08 are not satisfied.

(Tr. 22) (citations omitted).

Ms. Thornton argues she "satisfied the criteria of the Listing prior to her date last insured when her BMI was below 17.50 on November 2, 2016, April 24, 2017, May 2, 2017, June 29, 2017, August 13, 2021, and January 12, 2022." (ECF #10 at PageID 1118). But the ALJ also found Ms. Thornton did not meet Listing 5.08's other requirement that her weight loss was "due to any digestive disorder despite adherence to prescribed medical treatment." Ms. Thornton does not argue in her brief that she satisfied this requirement. (*See* ECF #10 at PageID 1117-20).[6] The court need not scour the record for errors unidentified by the claimant's counsel. *McClellan v. Astrue*, 804 F.Supp.2d 678, 688 (E.D. Tenn. 2011). The court could reject this argument on that basis alone.

At the same time, substantial evidence supports the ALJ's findings that Ms. Thornton did not meet Listing 5.08. The ALJ found that while Ms. Thornton suffered from gastritis, a digestive disorder, and was treated for GERD, she discontinued the prescribed treatment. (Tr. 22). Her gastronomy records indicate "she took herself off the pantoprazole [in July 2021] and states her pain has improved since then." (*See* Tr. 918). Thus, despite the ALJ's misinterpretation of Listing 5.08's duration requirement, Ms. Thornton has not shown she meets the other requirement of the listing, making the ALJ's use of an incorrect duration period harmless.

I thus decline to recommend remand on this basis.

---

[6]        Notably, she omits this requirement from her recitation of the listing's criteria. (*See* ECF #10 at PageID 1117-18).

## II.       Medical opinions

Next, Ms. Thornton argues the ALJ's evaluation of Dr. Ingat's opinion did not address the consistency factor and the ALJ failed to explain the omission from the RFC of limitations Dr. Saghafi opined to when the ALJ found his opinion persuasive. (ECF #10 at PageID 1122-23). The Commissioner responds that the ALJ properly evaluated the supportability and consistency of Dr. Ingat's opinion and the complained-of portion of Dr. Saghafi's opinion—that she has vertigo for up to 12 hours—is a diagnosis, not an opinion, and the ALJ included RFC restrictions accounting for vertigo. (ECF #12 at PageID 1142-44).

### A.       Dr. Ingat's opinion

Ms. Thornton argues the ALJ's finding—that Dr. Ignat's opinion was unsupported because Dr. Ignat's notes show normal range of motion and strength—was neither supported by the ALJ's analysis nor consistent with the other evidence. (ECF #10 at PageID 1120, 1122).

As part of the RFC assessment, the ALJ must review all medical opinions and explain how persuasive she finds them. *See* 20 C.F.R. § 404.1520c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that tend to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," the two most important factors. *See id.* § 404.1520c(b)(2). Consistency (the factor at issue) is "the extent to which the opinion is consistent with evidence

from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5853 (Jan. 18, 2017).

The ALJ's explanation should "generally include[] an assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* at 5859. The reasons for the ALJ's conclusions must be stated in a manner that allows the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). But an ALJ need not specifically use the terms "supportability" or "consistency" so long as the analysis substantively engages with those factors. *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022). If the ALJ discusses both consistency and supportability and substantial evidence supports that discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

The ALJ analyzed Dr. Ignat's opinion as follows:

> The physical medical source statement completed by Dr. Ignat is unpersuasive. This checklist type form notes extreme limitations that are unsupported by the record. He noted the claimant could sit only 5 hours a day and stand/walk less than 2 hours a day. He noted the claimant would need unscheduled breaks every two hours for 20 minutes. He noted that the claimant could rarely lift 10 pounds and occasionally lift less than 10 pounds. He noted the claimant is incapable of even low stress work. These findings are unsupported by the record that note the claimant had a normal gait and had normal musculoskeletal strength. Additionally, Dr. Ignat did not provide articulation for the claimant's inability to perform low stress work or being off task 20% of the workday. Dr. Ignat's notes show normal range of motion and strength but some tenderness and mild synovitis. For these reasons, this report is unsupported by the record and is unpersuasive.

(Tr. 27) (citations omitted).

14

Although the ALJ does not mention the consistency factor by name, the analysis applied and substantively engaged with the consistency factor. For instance, the sentence "These findings are unsupported by the record that note the claimant had a normal gait and had normal musculoskeletal strength" refers to the supportability factor, but articulates medical evidence that contradicts Dr. Ignat's opinion, the core reasoning behind the consistency factor. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. at 5853 (Consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim."); *see also Dallas v. Comm'r of Soc. Sec.*, No. 1:20-cv-1720, 2021 WL 5428827, at *11 (N.D. Ohio Oct. 26, 2021) ("Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources"), *report and recommendation adopted*, 2021 WL 5416718 (N.D. Ohio Nov. 19, 2021).

Reading the decision as a whole and with common sense, as the court must, *see Buckhanon ex rel. J.H. v. Astrue*, 368 F.App'x 674, 678-79 (6th Cir. 2010), the ALJ's earlier analysis provides substantial evidence for that finding. While recapitulating the medical evidence earlier in the decision, the ALJ noted an April 2017 examination "of all extremities showed full range of motion bilaterally. She had normal sensation in both upper and lower extremities. Normal movement of both upper and lower extremities was noted." (Tr. 24) (citing Tr. 825). And the ALJ noted that again in May 2022 "[o]n examination, she had mild weakness in the bilateral L3-4 innervated muscles. She had normal muscle strength, tone, and bulk . . . Gait was narrow based and stable. Tandem gait was intact. She was able to walk on heels and toes . . . ." (Tr. 24) (citing Tr. 1002). These findings are inconsistent with Dr. Ignat's opinion of limiting arthritic pain because a claimant's muscle strength, sensation, range of motion, and gait can indicate how a claimant's pain

affects her mobility. *See, e.g., Pitman v. Comm'r of Soc. Sec.*, No. 1:22-cv-711, 2023 WL 3510752, at *16 (N.D. Ohio Apr. 10, 2023), *report and recommendation adopted*, 2023 WL 3496942 (N.D. Ohio May 17, 2023).

Ms. Thornton's other argument that the ALJ's conclusion was not "consistent with the remainder of the evidence" attempts to reapply the persuasiveness factors. (*See* ECF #10 at PageID 1122). Ms. Thornton argues Dr. Ignat's opinion should be persuasive based on the opinion's consistency with other evidence and Dr. Ignat's treating relationship. (*Id.* at PageID 1122-23). But even if Ms. Thornton shows how Dr. Ignat's opinion is persuasive under her application of the factors, it does not show that the ALJ's application of those factors lacks substantial evidence. Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

I thus decline to recommend remand on this basis.

### B.      Dr. Saghafi's opinion

Next, Ms. Thornton argues the ALJ erred by concluding Dr. Saghafi's finding that Ms. Thornton suffered from vertigo for up to 12 hours was persuasive but omitting any limitations related to that finding without explanation. (*See* ECF #10 at PageID 1123-24). Under Social Security Ruling (SSR) 96-8p, if the ALJ's "RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." *Kinney v. Comm'r of Soc. Sec.*, No. 23-3889, 2024 WL 2273365, at *3 (6th Cir. May 20, 2024); *see also* SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). But Ms. Thornton has not shown the RFC conflicted with Dr. Saghafi's opinion by omitting a limitation for vertigo.

After diagnosing Ms. Thornton with vertigo, Dr. Saghafi opined about her functioning:

> The claimant is able to lift, push, and pull sufficiently to be able to perform ADL's and lift up to 20 lbs. The claimant is able to bend, walk, and stand for at least 60 min at a time. The claimant is able to understand the environment as well as peers and communicate satisfactorily. The claimant is able to travel independently.

(Tr. 807). Ms. Thornton argues: "Specifically, the RFC erroneously precluded the limitation regarding the fact that Plaintiff would have Vertigo." (ECF #10 at PageID 1123-24). But it is unclear to what limitation Ms. Thornton refers. Dr. Saghafi does not identify any particular limitations that are expressly tied to vertigo; he discusses Ms. Thornton's capability to lift, push, pull, bend, walk, stand, understand, communicate, and travel generally. Thus, there is no vertigo limitation for the ALJ to have omitted.

Looking at Dr. Saghafi's opinion about Ms. Thornton's functioning, there is no conflict between that opinion and the RFC. The RFC need not match the exact language of medical sources so long as substantial evidence demonstrates the ALJ adequately portrayed the claimant's limitations in the RFC. *Aerial T. v. Comm'r of Soc. Sec.*, No. 2:23-cv-04188, 2025 WL 798367, at *3 (S.D. Ohio Mar. 13, 2025). The RFC limits Ms. Thornton to light work. (Tr. 23). Social security regulations define light work to involve "lifting no more than 20 pounds" and "requires a good deal of walking." 20 C.F.R. § 404.1567(b). Thus, a limitation to light work accurately reflects Dr. Saghafi's opinion that Ms. Thornton can lift up to 20 pounds and bend, walk, and stand for an hour at a time. *See Horn v. Comm'r of Soc. Sec.*, No. 1:13-cv-610, 2014 WL 5107598, at *4 (S.D. Ohio Oct. 10, 2014) ("However, Dr. Swedberg opined that Plaintiff could stand for 3 hours, walk for 1 hour, and sit for 4 hours, which would not preclude light work."). Because the RFC does not conflict with Dr. Sagahfi's opinion, there was nothing for the ALJ to explain under SSR 96-6p.

I thus decline to recommend remand on this basis.

### III.    SSR 16-3p

Last, Ms. Thornton challenges the ALJ's evaluation of her testimony albeit with an unclear

argument. First, she says: "For the reasons set forth below, it is clear that the ALJ's findings in this

matter did not comply with the criteria of [Social Security] Ruling 16-3p." (ECF #10 at PageID

1125). This seemingly posits the ALJ misapplied the relevant legal standard or the ALJ's findings

lacked substantial evidence. Yet later she argues, "Discounting Plaintiff's complaints was in error as

there was no stated basis for this incorrect determination" and the ALJ "failed to articulate any

supportable rationale for his finding that [Ms. Thornton]'s statements, as detailed above, were not

entirely consistent with the medical evidence." (ECF #10 at PageID 1127). This would argue not

that the ALJ's explanation was in error, but that the ALJ did not *articulate* an explanation at all.[7]

Despite the shifting arguments, the Commissioner responds that the ALJ did articulate an

explanation and found that Ms. Thornton's testimony was inconsistent with the normal

examination findings and the gaps in her treatment history. (ECF #12 at PageID 1145-46).

SSR 16-3p requires the ALJ "explain which of an individual's symptoms [the ALJ] found

consistent or inconsistent with the evidence in [the] record and how [the ALJ's] evaluation of the

individual's symptoms led to [the] conclusions." 2017 WL 5180304, at *8 (Oct. 25, 2017).

Additionally, the decision must "contain specific reasons for the weight given to the individual's

symptoms, be consistent with and supported by the evidence, and be clearly articulated so the

---

[7]    Compounding the confusion, Ms. Thornton also argues "[i]t is clear that the evidence in this matter established that Plaintiff satisfied the criteria set forth in [Social Security] Ruling 16-3p." (ECF #10 at PageID 1127). But SSR 16-3p is not a set of criteria a claimant can meet; it is a two-step process under which an ALJ will evaluate a claimant's symptoms and the relevant factors that guide the analysis. *See* SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).

individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.* at *11.

In evaluating the claimant's subjective reports of symptoms, the ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. *Id.* at *5-8. The ALJ also uses the factors outlined in 20 C.F.R. § 404.1529(c)(3) to evaluate the claimant's statements:

1.   A claimant's daily activities;
2.   The location, duration, frequency, and intensity of pain or other symptoms;
3.   Factors that precipitate and aggravate the symptoms;
4.   The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5.   Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
6.   Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
7.   Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. *See Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005). But the ALJ's justification is "particularly important" in cases involving fibromyalgia where a claimant's "subjective pain complaints play an important role in the diagnosis and treatment of the condition." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

Here, the ALJ provided specific reasons for discounting Ms. Thornton's testimony, primarily by comparing Ms. Thornton's account of her back pain to the objective medical evidence. The ALJ discussed the available imaging, including the electromyograph showing "borderline right L3-4 lumbar radiculopathy with no active denervation"; the x-ray imaging of her spine, which yielded normal findings and showed no instability; and a radiograph (taken after her

date last insured) that found only mild degenerative changes. (Tr. 24) (citing Tr. 1003, 1006, 1065). The ALJ discussed physical examination findings (including by Dr. Ignat) showing mild synovitis in her hands but yielding otherwise normal findings in muscle strength, range of motion, and gait. (Tr. 24) (citing Tr. 802, 825, 1002, 1025). The ALJ discussed Ms. Thornton's testimony and compared it to the objective medical evidence as required by SSR 16-3p and 20 C.F.R. § 404.1529(a) and concluded the imaging and physical examinations did not reflect symptoms as severe as she described.

The ALJ also discussed "the type, dosage, effectiveness, and side effects" of Ms. Thornton's medication, *see* 20 C.F.R. § 404.1529(c)(3)(iv), by noting she had previously resolved her lower-back and sacroiliac joint pain in 2017 and did not need medication from 2017 to May 2021. (Tr. 25-26, 801-02). Not needing medication to control pain over that period is inconsistent with a claim of disability beginning in 2015 based in part on that pain. Similarly, the ALJ discussed Ms. Thornton's "[t]reatment, other than medication," *see* 20 C.F.R. § 404.1529(c)(3)(v), by noting the gaps in her treatment history. As the Sixth Circuit observed, "In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment. A failure to do so may cast doubt on a claimant's assertions of disabling pain." *Strong v. Soc. Sec. Admin.*, 88 F.App'x 841, 846 (6th Cir. 2004).

Ms. Thornton points to Dr. Ignat's examinations and medical opinion, hospital visit records, and other examination notes to back up her testimony. (ECF #10 at PageID 1126). But a Plaintiff does not demonstrate a violation of SSR 16-3p simply by reiterating the same subjective symptoms she believes should have been credited by the ALJ. *Zingale v. Kijakazi*, No. 1:20-cv-2197, 2022 WL 824148, at *8 (N.D. Ohio Mar. 18, 2022). And the ALJ discussed much of the same

evidence, including Dr. Ignat's physical examinations. The court cannot reweigh the same evidence before the ALJ and arrive at a different conclusion. *See Brainard*, 889 F.2d at 681.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: November 25, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). **Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). **Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). **Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'"** *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). **The failure to assert specific objections may in rare cases be excused in the interest of justice.** *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).